BANK OF MAINE, N.A.

v.

**Hal WEISBERGER, Trustee**

**and**

**Barbara Harthorn, Intervenor.**

Supreme Judicial Court of Maine.

Argued June 6, 1984.

Decided July 6, 1984.

---

Sanborn, Moreshead, Schade & Dawson, Linda B. Gifford (orally), Charles E. Moreshead, Augusta, for plaintiff.

Preti, Flaherty & Beliveau, Robert Checkoway, Portland, for Maine Bankers Assn., amicus curiae.

Wright & Mills, P.A., S. Peter Mills (orally), Nancy Diesel Mills, Skowhegan, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

This appeal in a mortgage foreclosure case raises questions of the meaning and enforceability of the provision of a promissory note setting interest at "prime + 1%." In the Superior Court, defendant borrower argued that the interest provision is unenforceable and that accordingly plaintiff Bank of Maine is entitled to no more interest than the 6% maximum set by 9–B M.R.S.A. § 432(1) (1980). The Superior Court rejected that argument and so do we. We, however, vacate the Superior Court's award of attorney's fees to the Bank, since we can find neither contractual nor statutory authority for departing from the so-called American Rule.

### The Facts

In February 1979 Bank of Maine, Bruce Gardner, and Mark Kierstead, as trustees of the Barbara Harthorn Trust, executed and delivered a promissory note in favor of Bank of Maine for $80,000. The stated annual interest rate on this promissory note was "prime + 1%." The note was secured by a mortgage on real estate in Cornville owned by the trustees. In October 1980 the trustees executed and delivered to the Bank a second promissory note, this time for $11,500 and bearing interest of 18% per annum. The second note was also secured by a mortgage on the same Cornville real estate. The following month the Bank resigned as one of the trustees and thereafter demanded full payment on the notes because of an extended delinquency in payments.

In January 1981 Bank of Maine commenced this action pursuant to 14 M.R.S.A. § 6321 (1980), amended by P.L.1981, ch. 429, seeking judicial foreclosure of the mortgages securing the two notes. This foreclosure action, commenced in the District Court (Skowhegan), was later removed to the Superior Court. Named originally as defendants were the two remaining trustees, Gardner and Kierstead. Following their subsequent resignation, Hal Weisberger replaced them as the sole trustee and he was substituted as a defendant in this suit. Barbara Harthorn, the settlor and one of the beneficiaries of the trust bearing her name, was permitted to intervene as a defendant. Hereafter both defendants will be jointly referred to as the "Harthorn Trust."

In November 1982 fire destroyed the house located on the property that was mortgaged to secure the $80,000 and the $11,500 promissory notes. In a separate action the Superior Court ordered that the $125,000 insurance proceeds from the fire loss be applied to the debts on the two notes. Principal and interest on the $11,500 note were thereby paid in full. A dispute arose, however, over the amount of interest due on the $80,000 note. Applying

an interest rate of one percent higher than its prime rate, the Bank computed the principal balance remaining on that note after exhausting the insurance proceeds to be about $25,000. On the other hand, the Harthorn Trust contended that the note's interest provision is not enforceable and therefore does not constitute "an agreement in writing establishing a different rate" than the statutorily prescribed maximum legal rate of 6 percent per year.[1] If correct in that position, the Harthorn Trust would be entitled to about $11,700 of the insurance proceeds, after paying off all principal and interest due on both notes, and no foreclosure of the mortgages on the Cornville real estate would be proper.

On February 16, 1984, the Superior Court entered judgment in favor of Bank of Maine on both its own complaint for mortgage foreclosure and the Harthorn Trust's counterclaim.[2] It specifically rejected the Trust's claim in regard to the rate of interest applicable to the $80,000 note. On the mortgage note the court found due $25,461.99 in principal, plus interest to January 4, 1984, of $1,890.54, plus interest thereafter on the principal balance at the annual rate of prime plus 1%. It ordered foreclosure and sale of the mortgaged real estate in Cornville and directed the priorities for disbursing the gross proceeds of the sale, including the payment of $2,800 to the Bank's attorneys as reasonable fees for services rendered in connection with the foreclosure.

### I. Rate of Interest

█ The interest issue raised by the Harthorn Trust on appeal is a narrow one. Before us the Trust does not assert any claim of fraud or duress in the making of the $80,000 note providing for interest at "prime + 1%." Furthermore, it cannot be argued that the parties to the note meant to be silent on the subject of interest; it is plain that the parties' writing at least purports to set the rate of interest. Nor can there be much dispute that "prime" "is, in general, the rate at which the best borrowers can borrow." *Associated East Mortgage Co. v. Highland Park, Inc.*, 172 Conn. 395, 400, 374 A.2d 1070, 1073 (1977). The Trust contends, however, that the $80,000 note does not contain an enforceable agreement as to interest, first, because "prime + 1%" is fatally ambiguous in failing to specify a particular bank's prime and, second, because any given bank's prime is so subject to change at the discretion of that bank that there is no prior agreement as to interest. We find no merit in either point.

On the Trust's first point, the Superior Court correctly concluded that "prime" refers to the prime of the lender, Bank of Maine. The Superior Court had before it the affidavits of two of the original three

---

1. 9–B M.R.S.A. § 432(1) (1980) reads in full:
 **1. Interest absent in writing.** The maximum legal rate of interest on a loan made by a financial institution, in the absence of an agreement in writing establishing a different rate, shall be 6 percent per year.

2. Defendants filed a notice of appeal on January 26, 1984, from the January 4 "Order on Motion for Summary Judgment" and did not file a second notice of appeal following the entry of final judgment on February 16, 1984. The appeal thus is technically premature, *see York Mutual Ins. Co. of Maine v. Mooers*, 415 A.2d 564 (Me. 1980), but in distinction to *York Mutual* we do in the instant appeal have before us the final judgment entered by the Superior Court. All the parties, appellee as well as appellants, have briefed and orally argued the appeal as if it were taken from the February 16 final judgment. Although we do not approve the way appellants have here proceeded, we do recognize that as a practical matter this appeal is in the same position (except for the filing of a second notice of appeal) as the *York Mutual* appeal would have been in after final judgment was entered on remand. We are also influenced by the instruction of 4 M.R.S.A. § 57 (Supp.1983–1984) that "[w]hen the issues of law presented in any case before the law court can be clearly understood, they shall be decided, and no case shall be dismissed by the law court ... for want of proper procedure if the record of the case presents the merits of the controversy between the parties." In the very special circumstances here present, where neither any prejudice to appellee nor any damage to institutional interests will result, we disregard the prematurity of appellants' notice of appeal and their failure to refile after the February 16 entry.

trustees, both of whom in representing the borrower Trust averred that they understood "prime" to mean Bank of Maine's prime. Even without those affidavits, such would be the only reasonable interpretation of the note language. Absent some specific indication to the contrary, a bank's use of "prime," without more, in a lending instrument would normally be understood to mean that bank's prime.

As to the Trust's second point, the Superior Court was fully justified in concluding that Bank of Maine's prime rate was not subject to arbitrary adjustment at its whim. The prime rate is the central guiding point for a bank in the conduct of its daily lending business. The affidavits before the Superior Court showed that Bank of Maine uses the prime rate, or rates tied to the prime, in many, if not most, of its loan transactions. The prime rate is set by reference to general money market conditions.[3] We will infer an obligation resting on the Bank to make its redeterminations of its prime in good faith and in the ordinary course of business. With such limitations on the discretion retained by the lender, the interest provision constitutes "an agreement in writing" that forecloses the application of the 6% legal interest statute. *See Constitution Bank and Trust Co. v. Robinson*, 179 Conn. 232, 425 A.2d 1268 (1979) (interest rate of "prime plus 1½%" is determined according to market conditions and affects many borrowers so that the bank cannot alter it at will); *cf. Lucas v. Maine Commission of Pharmacy*, 472 A.2d 904 (Me.1984) (statutory requirement that pharmacists graduate from accredited school is not unconstitutional delegation to accrediting organization because of other purposes for which accreditation process is used).

Although the prime rate will fluctuate in ways the parties may not have fully anticipated, the parties still have agreed to tie the interest rate on the note to that fluctuating prime. Once the Bank adopts its daily prime, the amount due on the note becomes "merely a matter of calculation." *Topline Equipment, Inc. v. Stan Witty Land, Inc.*, 31 Wash.App. 86, 90, 639 P.2d 825, 829 (1982). In *Matter of LeBlanc*, 622 F.2d 872, 878–79 (5th Cir.1980), the court held that "prime plus 4%" was fixed in writing saying:

> A rate of four points above prime is fixed in writing within the meaning of the Louisiana statutes and the Louisiana civil code. There is no danger of a swearing match over what the parties meant by four points above prime. Thus, holding that such an interest rate is not fixed in writing would not serve the purposes of the parol evidence rule. Furthermore, variable interest rates keyed to the prime rate are commonplace in business loans. This Court in the absence of any case authority or logical reason, will not torture the words of a statute to invalidate thousands or perhaps tens of thousands of loans.

*See also Constitution Bank and Trust Co. v. Robinson*, 179 Conn. at 236, 425 A.2d at 1271. We conclude that the parties, fully aware of the consequences of their action, agreed to an interest rate pegged at one percentage point above the prime rate of Bank of Maine. The $80,000 note thus contained "an [enforceable] agreement in writing establishing a different rate" of interest than the 6% maximum that is otherwise prescribed by 9–B M.R.S.A. § 432(1).

## II. *Attorney's Fees*

■ The Harthorn Trust also argues that the Superior Court erred in awarding Bank of Maine attorney's fees in the amount of $2,800. As this court has often held, there is no general right to attorney's

---

3. The Harthorn Trust puts an incorrect focus on the ascertainability of Bank of Maine's prime rate. It makes no difference whether, as the Trust disputes, one can simply read a financial newspaper to find a national prime rate. For present purposes, all that matters is that Bank of Maine has a daily prime rate, which can be ascertained simply by a telephone call to one of its loan officers.

fees. The American Rule still prevails except when modified by a specific agreement of the parties or a controlling statute. *See Barber v. Inhabitants of Town of Fairfield,* 460 A.2d 1001, 1008 (Me.1983); *Vance v. Speakman,* 409 A.2d 1307, 1311 (Me.1979); *Thiboutot v. State,* 405 A.2d 230, 238 (Me.1979), *aff'd,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

 At the outset, we reject the Bank's argument that it is entitled to attorney's fees on the basis of the terms of the $80,000 note. That note, which is on a form that apparently is normally used for collateral loans rather than real estate mortgage loans, lists the "1st mortgage on a 250 acre estate known as Hilton Hill, located in Cornville, Maine" as the "collateral security." In the event the Trust defaulted on the note, Bank of Maine is given the power "to sell, assign and deliver the whole of said property . . . ." The note then provides that "[a]fter deducting all legal or other costs and expenses of collection, storage, custody, sale and delivery, the residue of the proceeds of any such sale or sales" will be used to satisfy the Trust's liabilities under the note. On its face the note gives the lender a right to attorney's fees, if at all, only out of the proceeds of a sale carried out pursuant to the power of sale under the note.[1] The $80,000 note does not create a general right to attorney's fees as damages for breach of contract.[5] The Bank did not proceed under the power of sale given it in the note, but rather sought a judicial foreclosure under 14 M.R.S.A. § 6321. The Bank voluntarily chose not to pursue the avenue of relief granted it by the note. The right to attorney's fees as a contractual right is strictly limited to actions taken pursuant to that contract. *See Ocean National Bank of Kennebunk v. Odell,* 444 A.2d 422, 427 (Me.1982) (error to award fees for cost of seeking a judgment on deficiency on overdue note following sale of the collateral where note gave right to fees only for costs of selling the collateral); *see also Morgan v. Morgan,* 406 S.W.2d 347, 351 (Tex.Civ.App.1966) (suit for breach of contract does not entitle plaintiff to statutory attorney's fees provision where plaintiff actually collects by appropriating payments of defendant). We thus must conclude that the Superior Court erred in relying upon the $80,000 note to award attorney's fees out of the proceeds of the judicial sale.

The Bank also puts forth a back-up argument. It contends that it is given a right to attorney's fees by 14 M.R.S.A. § 6101 (Supp.1983–1984),[6] which now declares that "[f]or the foreclosure of a mortgage by any method authorized by this chapter [including a judicial foreclosure under 14 M.R.S.A. § 6321], the mortgagee ... may charge a reasonable attorney's fee which shall be a lien on the mortgaged estate." But, unfortunately for the Bank's back-up position, that attorney's fee statute did not apply to

---

4. We do not decide whether the $80,000 note by itself gave the Bank a power of sale over the mortgaged real estate or whether attorney's fees could be recovered by the mortgagee upon a sale under that power.

5. In contrast to the $80,000 note, the $11,500 note did explicitly provide that the Harthorn Trust "agree(s) to pay all costs of collection including a reasonable attorney's fee if this note is placed in the hands of an attorney for collection after default, whether or not suit is brought to enforce collection."

6. Since September 18, 1981, 14 M.R.S.A. § 6101 (Supp.1983–1984), as amended by P.L.1981, ch. 429, § 1, has provided in full:

§ 6101. Attorney's fees

For the foreclosure of a mortgage by any method authorized by this chapter, the mortgagee or the person claiming under him may charge a reasonable attorney's fee which shall be a lien on the mortgaged estate, and shall be included with the expense of publication, service and recording in making up the sum to be tendered by the mortgagor or the person claiming under him in order to be entitled to redeem, provided the sum has actually been paid in full or partial discharge of an attorney's fee.

The subject matter of the simultaneous amendment to 14 M.R.S.A. § 6321 has nothing to do with the present foreclosure of a first mortgage. P.L.1981, ch. 429, § 3 (different procedures set up for foreclosure of "any mortgage other than one of the first priority").

section 6321 foreclosures at the time (January 1981) when the Bank brought this action. The mortgagee's right to charge attorney's fees in an action such as this arose only when P.L.1981, ch. 429, § 1, became effective on September 18, 1981.[7] A standing rule of statutory construction, declared by 1 M.R.S.A. § 302 (1979), withholds the benefit of the new attorney's fees provision from Bank of Maine as the plaintiff in this pending foreclosure action. With direct pertinence here, section 302 provides:

> Actions and proceedings pending at the time of the passage ... of an Act ... are not affected thereby.

Neither the $80,000 note nor the mortgage foreclosure statute authorized the Superior Court's award of attorney's fees to the Bank in this case.

The entry is:

Judgment of the Superior Court modified by striking the order for payment of attorney's fees; judgment as so modified affirmed.

All concurring.

---

7. Prior to September 18, 1981, 14 M.R.S.A. § 6101 (1980) provided in full:

**§ 6101. Attorney's fees**

For the foreclosure of a mortgage by either method prescribed by section 6201, subsections 2 and 3, or by section 6203, or by sale under a power of sale in the mortgage, the mortgagee or the person claiming under him may charge a reasonable attorney's fee which shall be a lien on the mortgaged estate, and shall be included with the expense of publication, service and recording in making up the sum to be tendered by the mortgagor or the person claiming under him in order to be entitled to redeem, provided said sum has actually been paid in full or partial discharge of an attorney's fee.